United States of America v. Rivera, 24-2109. We have Attorney Singer for the appellant, and we have AUSA Simon for the appellate United States. Mr. Singer, welcome. Thank you, Your Honor. And the microphone is yours. Thank you, sir. It may please the Court, again, my name is Murray Singer. I represent the appellant, Jonathan Rivera. This appeal involves two special conditions of supervised release that were imposed in sentencing. I would like to address them in reverse order, if I may, just to keep us on our toes, I guess. The second special condition that is being challenged is the suspicionless and constant monitoring of any Internet-connected or Internet-capable electronic device that Mr. Rivera will have in his possession once he is released from prison. It is as broad an imposition on Mr. Rivera, on his life, on anything and everything going on in his life, as can be imagined. And what's interesting is to contrast that with the first special condition of supervised release. It's on page 158 of the appendix, which is the traditional search condition, which permits for a search by probation of his home and property and devices and vehicle and papers. Over the last several years, this Court has made clear that that condition has to be narrowed to there being reasonable suspicion, some basis for conducting that search. And this search condition for the monitoring of the computer is broader than that condition, and it has no limitation on it at all. And we submit that based on the facts of this case, who this defendant is, he was in his 30s. In this case, he had no prior criminal conduct. The criminal conduct here were a series of discrete incidents. Yes, they were on a computer. I don't run across many cases in my practice anymore where something didn't have to do with a phone or a computer. Virtually everything is on a computer now, including criminal conduct. There were discrete incidents. There is no evidence that he was particularly sophisticated with computers. He had willingly or consented to a search of his computer at the time he was arrested, and there was no other evidence that he was engaging in this conduct. Could you tell me your understanding of the monitoring condition? What exactly it means to monitor? Does that presume an inanimate computer process, or could that literally encompass someone at the other end of an Internet wire watching everything that happens on his computer? Yes, is the answer. It permits any. The condition says that allows the probation to survey and monitor all activity on any computer. So if you're asking practically, does it mean that there's going to be someone sitting 24-7 watching? I suspect not. That is simply a manpower issue, I suppose. Do you know what they do these days, right now? Because I know that these monitoring softwares, perhaps the government knows, maybe not, but is there a standard software package or service that the Southern District Probation Office uses these days? Because usually they have a contract with some sort of a provider and there's a sort of standard suite. The thing is, Mr. Rivera is presumably still serving a sentence, right? Correct. So by the time he gets out, I mean, I would imagine any software is probably going to be obsolete and there will be some new package out there. So I suppose we don't know exactly what's going to happen when he's released? I know that that was raised by the government in their brief, and I submit that that's not a practical concern here. Our concern is that no matter what the software is, what this special condition permits is monitoring of anything and everything without cause, without basis, simply because he used a computer to commit this crime. Well, I guess where I was going is in some of our cases we've talked about some of the specific installations that the probation offices use, and in some cases the software or the service used, I think one was called remote.com at the time, I don't even know if it exists now, that it would only ping the probation office if something that qualified as contraband. Suspicious activity. Yeah, suspicious activity, something that looked like child pornography or whatever it might be. I assume that you can set the parameters and that the monitoring company alerts the probation office as to what it is. Yes, it can, and I suspect that if that had been a condition or one of the parameters placed into the special condition, I wouldn't be here arguing this point to the court. The point is that this special condition... That would be a useful thing, actually, if I could pause you for a second. Would the defendant have an objection to a more tailored condition that was tailored to, say, monitoring, in all the words that are here, but to, say, for adult pornography or child pornography or something like that? I have not discussed that specifically with him, so I can't give you his answer on it. I suspect that I would be hard-pressed to make the claim that if there were some triggering device, some type of suspicion that triggered it, that is a limitation that would make this special condition reasonable and connected to the facts of the case and sufficiently tailored as to not interfere with his entire life that is being conducted. All of our lives are being conducted electronically on our phones and our computers. Can I also ask you, and I understand you were just appointed for purposes of appeal, so you've taken the case afresh, as it were. But can you just confirm for me that there was no objection to this condition before the district court? That is correct. There was no objection, and it would be reviewed by district court under the plain error standard. For plain error. So what would you say is the best case that tells us that this was plain error, that even absent an objection, the district court was derelict in its duties in not on its own recognizing that this was a violation of law, without anybody complaining about it, because that's the plain error standard. What's the best case? One case cited by, again, the brief was actually filed by prior counsel.  I adopted it because I thought it was very good. One of the cases cited is United States v. Salazar. It's a 2023 Westlaw site, 4363247. It is cited in appellant's brief. That is a case where the computer monitoring was, where the court actually noted that it was, that the court has approved electronic monitoring that is limited by some suspicious activity that triggers it. That was in 2023. That was before the sentencing here. So it is our position that this type, and the general rule that the narrowing, some type of narrowing, particularly when a fundamental right is impacted, is important and is necessary and is certainly known to sentencing courts as well as this court, because it's been discussed in many ways over the years. But Salazar is one place that I would look to. And if I can touch briefly on the other condition, I know my time is running short. The condition that Mr. Rivera not be permitted to access or view adult pornography, we submit, has no factual basis in the record. Again, simply because he uses a computer or, as one of the doctors noted, he had reviewed pornography along the way. It does not create any particular, an individualized assessment that would lead to a concern about the viewing of adult pornography. It has nothing to do with this case or his background or his conduct. And we submit, based on the brief as well, that there was simply not a sufficient factual basis and certainly not an individualized assessment that would support that. Can I just ask you one question about that? I thought there was a psychiatrist evaluation, though, that recommended it, wasn't there? Well, a psychiatrist in broad strokes recommended that whatever the sex offender treatment program recommended, but didn't speak specifically to why this particular condition of adult pornography had anything to do with the case. Again, it's part of a generalized whatever they say we would recommend, and included in that is certainly the ability to say no to adult pornography. But I don't know that there was any finding to support that. It was done in very general terms and very limited discussion about it. So it's our view that the factual record simply doesn't support that broad a limitation on, again, what is a fundamental. I thought that assessment that a psychiatrist that walked through the personal history of Mr. Rivera and sort of told the narrative of how he began with adult pornography and how it escalated in his case. And it seemed apparent to me that by telling that narrative to say that sort of one led to another in his case, that seems like a factual predicate for the district court to say, well, look, if one led to another for this guy, then I don't want it to lead to child abuse or viewing of such forbidden materials again. If you can tell, that's the gateway for him. I don't believe the factual record supports that conclusion or that gateway theory of it, because I think they were unrelated over time. And I'll otherwise rely on the record for that. All right. Thank you very much. Thank you very much for coming in, Mr. Singer. Why don't we hear from the government? Your Honor, may it please the court. I'm Assistant United States Attorney Stephanie Simon. I represent the United States on appeal, as I did before the district court. I'd like to start, as Mr. Singer did, with an electronic monitoring condition. Mr. Singer asserts that the condition constitutes suspicionless and constant monitoring of his client and therefore is infirm. But this court just a few weeks ago in Brown in a published decision, which the government provided to the court in a 28-J letter, dispensed with that precise argument. The court said, while it is true that Brown, the defendant in that case, will be required to submit to initial and subsequent computer examinations, as well as the installation of monitoring software on his electronic devices, probation's ability to search his devices is not unfettered. The search condition permits searches only upon reasonable suspicion and only at a reasonable time and in a reasonable manner. And therefore, the condition was not infirm on that basis. The court also found in that case that the condition did not impose a greater deprivation of liberty than reasonably necessary. And I think it's worth pointing out that the condition in that case was identical to the condition imposed in this case. In fact, it was imposed by the same district judge and had the same language. But there were obviously different individuals that were involved. And one of the things I'm trying to figure out is I understand when we're dealing with a software, it seems like maybe your argument is this particular approach is always appropriate. If it's appropriate at all, it's appropriate in for a penny, in for a pound. And what's missing, I think, from the condition, and I'm trying to get my head around a little bit, is it's software. And it's in your computer. Where can it look? It can look everywhere. What's missing is what's it looking for. And if the implication, and it seems like it's what this court understood it to mean in Brown, is that it's in there and it's looking everywhere, but it's only, I guess, pinging somebody if there's reasonable suspicion, something that would generate reasonable suspicion, and only then can you search the device. Is that in the condition anywhere? Where do we see that limitation on what monitoring means? I agree with Your Honor that it's not in the condition itself, and the government submits in this case that that goes to the issue of ripeness. And that's precisely why in Bilan the court held that a substantive challenge to a monitoring condition was not right because it depends on the evolving technology. Well, the capacity to tailor might depend on the development of technology, and I think your argument makes a lot of sense. But the underlying instruction to probation about what to be looking for, that's something that derives from the nature of crime, the characteristics of the individual. And so here I don't see anything that puts any guardrails on not where the monitoring can look, because obviously it's got to be able to look everywhere, but what it can look for. And it seems to me that's a tailored to the individual crime question. If you have somebody convicted of complicated financial crimes, you may not have any basis to be pinging on the same things that you would ping on if somebody was convicted of possessing child sexual abuse materials or somebody who's convicted of a crime based on interactions with somebody through chat rooms. Isn't that something that needs to be tailored by the court to the crime, not based on the software? So I think I want to try to address your question. Sorry, that's a lot. No, I want to make sure I'm answering your question. I think there is nothing in the record that I'm aware of what the monitoring condition will be looking for. I do believe the question of how the monitoring software will function is a question of evolving technology, as Your Honor pointed out. And that's why the government submits that the question is not right for review, and that's what this court held in Ballon. The question of what the condition is looking for in Brown, the court addressed whether the condition, without addressing ripeness, because it was not raised in that case, the court addressed the question, which I think Your Honor is getting at, which is whether the condition is overbroad on its face and imposes a greater restriction on liberty than reasonably necessary. And the court found that the condition as written, which again is identical here, did not impose a greater deprivation of liberty than reasonably necessary. And I think that at a high level, what the monitoring condition permits is monitoring to see whether the defendant is violating the conditions of his supervised release. So would that be a permissible sort of judicial interpretation of the condition that when it says monitoring, what it means is searching for evidence of noncompliance with the conditions of supervised release? Well, I want to make sure that I'm reading the condition correctly. I mean, as you point out, I don't see anything in the condition that tells us what it's looking for. It just tells us where it can look, and the answer is everywhere. I think that's right. I'm not sure that I'm understanding, and I just want to make sure I'm addressing Your Honor's question, but I think you're correct that the monitoring condition on itself precisely, but I think that the condition on its face assumes that it's monitoring for violations of supervised release. So saying that's what it means by monitoring, not that there are filters involved essentially. It can go everywhere, but it's going everywhere with a filter, and the filter is looking for evidence that may suggest a violation. Well, I don't want to presuppose how the monitoring software would work because I don't think that there's anything in the record about how the monitoring software would function, and that precisely is the reason why the challenge in the government's view is not right. I mean, presumably, I don't know. I'll make this up, because I don't know, and I don't think it's in the record, how the putative software will work 180 months after the defendant was sentenced. But I would assume it would look for more than just hash values that match the NCMEC database. They would also look for access between the defendant's computers and known sites perhaps on the Internet that are used by pedophiles to prey upon children or something like that, or I suppose setting up aliases or new accounts or something under false identities. I don't know how capable the monitoring software is, but it could be more, my point is, than just looking for NCMEC hits. So I think you're absolutely correct, Your Honor. There's nothing in the record about how the monitoring software will function, and as Your Honor correctly pointed out, Mr. Rivera is not scheduled to be released until 2034. There may not be an Internet by then. I mean, who knows? I mean, AI may have taken over the world, and it's just done. And then we'll have a mootness. It'll be very quaint that we have these things called computers. It's like our children are regarded as quaint that we had typewriters or something. Right. The problem, though, is to the extent that we don't know what the software will look like, and I guess we don't know what the Internet potentially could look like, but because the condition as worded allows such a broad search, regardless of whether or not there's some kind of software in the future that is more pointed or not, because the condition doesn't say, well, it has to have, you know, the search is limited to this circumstance. And whether or not we have the capabilities now to do that in a targeted way or maybe in the future we were, I think it still raises a question of what it's allowing, the fact that it's allowing a broad search that is not sort of defined by, doesn't appear limited in a particular way, I guess. Well, Your Honor, I believe the court addressed that precise issue in Brown, and a panel of this court just a few weeks ago said, although the monitoring of the defendant's devices must be precisely targeted to the government's goal of ascertaining whether the defendant, in that case, was using electronic devices to commit a crime, that doesn't mean that probation needs to employ the least intrusive means. And the court pointed out, as Judge Nardini was suggesting, that for monitoring to be effective, some entity, whether it's probation or a third party, must be able to monitor a large swath of the defendant's internet activity to determine whether the defendant is engaged in prohibited conduct, whether that constitutes a new crime or a violation of the terms of his supervised release. And that's because, as this court pointed out in Brown, it would be very easy for a defendant who is interested in evading the monitoring technology to simply put offending material in a folder called taxes or a folder called family photos and therefore evade the monitoring software. And this court found that it was not appropriate to limit probation search. Nobody thinks monitoring software is going to look at the name of a file and not look at it based on what it says, right? It's getting out there and all the bytes, wherever they are, looking for certain triggers, I'm assuming. And what I'm struggling with is you're saying we can't argue about how to tailor it until we know what the monitoring software is, and it seems to me the individual characteristics of the defendant ought to be driving the condition, not the available monitoring software. And it may be that the condition has to be tweaked to accommodate what's technologically capable, but right now it seems like you're acknowledging an implicit limitation that's not apparent in the terms. And I think the Brown court did as well, which is that even though the software can go everywhere, the information that it can actually sweep up while it's there is limited in some way by the individual characteristics of the defendant and the crime and everything else. And I think, as you said, evidence of commission of a new crime, evidence of violation of the terms of condition released, which by definition would include commission of a new crime, that may well be sort of the right definition of the universe of what the software can pick up. There's nothing in the condition that actually says that. And I hear you that the court blessed this condition in Brown, but that was in the context of a very detailed assessment of this individual and his crimes, which were deeply computer-involved, and his history, which involved concealment to computers and other things. It was a very pervasively computer-driven and extensive criminal activity. Is it your position that because this condition wasn't deemed to be overbroad in Brown, it's never going to be overbroad for anybody else for whom some monitoring might be appropriate? So I want to try to answer your question on a few levels. One has to go to the issue of ripeness. This court addressed that precise issue in Belon and held that substantive challenges to electronic monitoring conditions of this type are not ripe because they depend on evolving technology by their very nature. And this court in Deutsch— I'm sorry to break it up a little bit. I guess just to jump in on the ripeness question, that's a little bit about what I was getting at before that I'm a little— I'm not sure I'm convinced it's unripe based on the we don't know what the technology is. When the condition sort of says this kind of search can happen, and whether it's well-targeted now or going to be a better target in the future, we can address the question of whether or not a search of this kind of condition, I should say, is viable now. So I guess I'm pushing back on the it's not ripe argument, which Brown does not address. You're correct that Brown doesn't address this issue, but I would respectfully submit that cases following Belon, including this court's decision in Deutsch, which is cited in both parties' briefs, held that although the procedural reasonableness challenge could be resolved now and the court in Deutsch resolved the procedural reasonableness challenge, the court held relying on Belon that it wouldn't pass on the substantive reasonableness challenge. Right, but were those cases based on a challenge to the software? Wasn't that part of— So they were raising over-breadth challenges of the kind that the defendant raises here, arguing that the imposition on liberty was greater than reasonably necessary to serve the purposes of sentencing. But I want to address the question on the merits, too, because if the court is not inclined to rule on ripeness grounds, I think the government's position is that the defendant cannot establish, certainly on plain error review, entitlement to relief. As Your Honor pointed out, the decision in Brown was based in part on the defendant's crime, his offense conduct, and his history and characteristics. Here, the offense conduct was deeply connected to the defendant's Internet use. As spelled out in detail in the government's brief, and relying on the entire sentencing record and Dr. McCarthy's report, the defendant here met a woman online using an Internet-enabled device. He propositioned that woman to engage in threesomes with him and have sex with his 10-year-old son. When she refused, he then convinced her to sexually abuse her 4-year-old child, record the abuse, and sent him videos of the abuse, not once but multiple times. All of this was using an Internet-enabled device. I mean, pretty much every crime we see these days involves at least a cell phone, if not a computer. Is that an argument that monitoring without any limitation as to subject matter is appropriate any time a device is used in a crime? I can't pass on every case. I can only tell you about the facts of this case. And, of course, as Your Honor pointed out, this case is on plain error review. The defendant cannot point to a case where an electronic monitoring condition of this type was held unlawful on similar facts. In fact, in Brown, there's a published decision of this court going the opposite way on facts which I would say are less favorable to the government. That was a fraud case. The defendant, yes, used the Internet. A case where no child was abused?  You're saying that the severity of the conduct here is so much more serious that the need for monitoring to avoid future harm would be more acute than worrying about somebody filing some fraudulent claim in the future? I think it goes to several of the sentencing statutory factors that are identified in the guidelines because it goes to the nature and circumstances of the offense, the history and characteristics of the defendant, and importantly, to Your Honor's point, protection of the public. Can I just back up? I think this is what I understand you're saying is about plain error review. When we're on plain error review, where a defendant does not object to the district court, the burden flips, right? If there's an error and it's been objected to, the government has a burden of showing that the defendant's substantial rights were not harmed, right? That's for 52A. But you're saying in plain error, now the defendant bears the burden of everything. A, showing error. B, showing that not just there was error, but it was clear or obvious. In other words, that the judge, as I think we have repeatedly said, or maybe it was the district court, was derelict in his duties in not noticing this on his own. And then third, substantial right. And fourth, manifested injustice, and the defendant has a burden of proving all those four in this situation. And he hasn't cleared that, you're saying, given, among other things, Brown. That's correct, Your Honor. Of course, if the defendant had objected, the standard would be abuse of discretion. I don't think on this factual record the defendant could even show that it would have been abuse of discretion for Judge Halpern to impose electronic knowledge. But that's only the first prong. So you say you would win on the first prong of plain error, but I assume you're saying that certainly he doesn't win on the second prong, which is not only does the district court have it wrong, and frankly pretty egregiously wrong to abuse his discretion, but there's no way that such an error could be deemed clear or obvious. That's precisely correct, Your Honor. I see my time is expired. Let me just see if there are any other questions. We've kept you and your colleague up for a significant amount of time, but I think they're being known for the questions. We thank you both. We will take the case under submission. And we do thank you both for coming in today, particularly Mr. Singer, who got dragged into this at the late stage of the litigation. So we will take the case under advisement, and we thank counsel. Thank you. We'll turn to the next case on the docket, which is 25-1830, Amanda Brooks v. Bright, Horizons Family Solutions et al. And we'll let counsel come up and get settled. Good morning. Good morning. Stephen Bergstein for the Plaintiff Appellant. Good morning. The key to this case, this is a Rule 12 dismissal case, the key to this case is the relationship between the plaintiff and her supervisor, Robin Carone. The plaintiff was Carone's only black director under Carone's supervision. Even prior to the promotion denial in this case, Carone subjected the plaintiff to a series of hostile and irrational supervisory actions sufficient to survive a Rule 12 motion to dismiss. Under this case, this court's rulings, and Littlejohn, Veda, and Down, and others, we don't have to make that a crime of patient case, but we do have evidence permitting an inference of discriminatory intent. Some of those acts of pre-promotion denial, disparate treatment include micromanagement and telling the plaintiff, even though she doesn't know her, that she doesn't trust her and she's going to be more harsh than her prior supervisor. But moving beyond that, which is relevant, but moving to one of the main concrete adverse actions in the case is the promotion denial. The same woman who had been treating plaintiff with hostility from the outset of the supervisor-employee relationship denies plaintiff a promotion, even though plaintiff was qualified. Can we just break this down? Because I know there are a number of different causes of action, and I just want to make sure analytically I'm following you. With respect to the denial of promotion claim, you've got Title VII, but you also have your 1981 with different limitations periods, right? Yes. So with Title VII, the failure to promote came before outside the limitations period, right? That's right. For Title VII only, right? That's right. But you do fall within the limitations period for 1981 claims for promotion, right? Correct. So is that what you're talking about here with respect to the 1981 claim? Yes. Okay. Yes, on the promotion denial. I just wanted to frame—thank you. Termination claim falls within the Title VII by one or two days. So the promotion denial is one of the key concrete adverse actions here, and plaintiff was obviously qualified based on the allegations and the complaint. She had a successful tenure in this role, but she was denied the position, and the one who got it was non-black, outside plaintiff's protected class, did not have the qualifications under the job description. He didn't have supervisory experience. And Cerrone tells the plaintiff, you didn't get the position because you lack experience managing people not like you. And I'm sorry. Just to help you follow along in your complaint, and I think I'm following you, just point us to the paragraph where you allege that the person who did get the promotion was not equally qualified, or was less qualified, rather. That's paragraph 89 to 91. Lopez did not have supervisory experience necessary for the position, and the plaintiff did, obviously. So that helps with the chronic patient case to the extent we have to assert that. But more importantly, we know what Cerrone said to the plaintiff about why she didn't get the position. You don't have enough experience managing people not like you. What does that mean? Under this Court's cases, drawing the inferences favorable to the plaintiff, that is a racial comment. Plaintiff doesn't have enough experience managing white subordinates. Plaintiff said, what are you talking about? And Cerrone digs herself deeper into a hole and makes reference to two of plaintiff's subordinates, an Asian subordinate by the name of Bai and a Latina subordinate by the name of Irizarry. And this only further supports plaintiff's claim because those two examples are, they're not white, and plaintiff had nothing to do with anything going on with them that was negative. In fact, plaintiff told Cerrone that Bai complained that Cerrone was discriminating against Bai, yielding a dismissive response from Cerrone and prompting Bai's resignation. So how does the justification that Cerrone offered allow the district court to dismiss the case under Rule 12? It's a problem. It's as close to direct evidence as you're going to see. Any HR department would be horrified to hear something like this being uttered in the workplace. But again, we're at Rule 12. This is an issue for discovery. So then we get to plaintiff's termination, and Cerrone again is part of the termination decision. Plaintiff is fired not long after she complains about discrimination in the workplace. Plaintiff reported Bai's discrimination complaints to Cerrone on multiple occasions throughout 2021, ending in October. And in December, November, December, plaintiff is fired. That's only two months later. So when you consider the comment relating to the promotion uttered by Cerrone and then plaintiffs. Can I just jump in a second? You said that the comments about Bai were in, I guess it was arranged from April to October, but she wasn't fired until March, right? Correct. Correct. The promotion denial was December. It was late 2021, shortly after plaintiff reported Bai's discrimination comments. The termination was in March, but Cerrone orchestrated the termination. So under cases like Bart v. Gala, Bickerstaff, when the discriminator. If I could just jump in for a second. Is there a concern about the time between the recording the comments about Bai, which let's say they went up until November, and then she was terminated in March of 2022? I agree with the assertion in your brief that there is not a fixed, you know, this many months is too long or this is too short. But what is the connecting? What do you see in the record to support the connection between those incidents and the termination in March? Well, we have timing. Plaintiff reported Bai's discrimination complaints to Cerrone from April through October 2021. And the following March, about four or five months later, plaintiff is terminated for false reasons relating to her alleged lack of compliance with COVID protocol. The timing is four or five months is within this court's framework for retaliation. And we cite cases in the brief to that effect. And even apart from timing, the fact that Cerrone orchestrated plaintiff's termination, and Cerrone is the one who made the racial comments in connection with the prior promotion decision, that's a problem for defendant on a motion like this. And under Littlejohn, Vega, and as well as Bart and Bickerstaff and all the cases involving discriminatory link in the employment relationship resulting in terminations, when a person makes a comment like Cerrone did, who ultimately fires plaintiff for a false reason, then you can infer that the discrimination motivated or caused the termination decision. Thank you. Okay. Thank you very much. You've reserved three minutes for rebuttal. Why don't we hear from counsel for the afternoon? We have Mr. Friedberg. Good morning, your honors, and may it please the court. My name is Ailey Friedberg, and I'm counsel for the appellees at Bright Horizons Family Solutions and the related entities. The district court correctly dismissed this case because the amended complaint never crosses a line from speculation to plausibility. The appeal tries to repackage conjecture as a mosaic, but the tiles that make up the narrative as asserted in the amended complaint don't fit together into a complete puzzle that creates a plausible claim upon which race and gender discrimination or retaliation can be sustained. The appellant asserts three basic theories, and each one of them are defective. The first is a discrimination claim based on disparate treatment that is premised on the treatment of alleged comparators. But the allegations in the amended complaint don't provide really any details, certainly any material details about the comparator's qualifications or how those comparators were treated. Does the complaint say that the comparator had less experience? Only on one occasion, your honor, with respect to the position that Ms. Brooks applied for. But with respect to that, that's the only description. The case law that we cited throughout the brief clearly says that when a discrimination claim is based on disparate treatment, the allegations in the complaint must demonstrate that the comparators are entirely, in all aspects, equal to the plaintiff. And that's required at the 12B6 stage? Yes, that is a pleading requirement to sustain disparate treatment. Does it say that there has to be a listing of all of the ways in which the comparator is comparable? You have to say that you have the same experience, you have the same salary, you have cases that say that level of detail is required at the 12B6 stage. I certainly would posit so. For example, the Faruqi case, the Faruqi v. Health and Hospitals case, which this court decided, stated that to sustain a discrimination claim based on disparate treatment, the complaint itself must plead that the comparators are similarly situated in all respects. Similarly, in the Budun v. Brightworks case, Judge Engelmeyer also echoed the same language that the comparators must—the allegations in the complaint must plead that the comparators are similar in all respects.